**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **RANDLE B.,**[1] | ) |
| | ) |
|    **Plaintiff,** | ) |
| | ) |
| **vs.** | )  **Case No. 3:20-CV-781-MAB**[2] |
| | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
|    **Defendant.** | |

<u>**MEMORANDUM AND ORDER**</u>

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Randle B. is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income (SSI) under Title II of the Social Security Act. The Administrative Law Judge (ALJ) determined that Plaintiff had a number of severe impairments but nevertheless retained the residual functional capacity to perform a reduced range of light work and could therefore return to his old job or work in various other positions. Plaintiff now challenges only the ALJ's finding that his chronic obstructive pulmonary disease (COPD) did not preclude him from a

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (Doc. 13).

reduced range of light work (Doc. 29).[3] For the reasons set forth below, the Commissioner's decision is reversed.

## PROCEDURAL HISTORY

Plaintiff applied for benefits on August 24, 2017, alleging he became disabled that same month due to various physical and mental conditions (Tr. 181–90). His claim was denied initially in February 2018 and upon reconsideration in April 2018 (Tr. 13, 101–05, 110–12). Plaintiff requested a hearing by an Administrative Law Judge, which was held on April 2, 2019 (Tr. 13, 33–49, 113). Following the hearing, ALJ Jeffrey Eastham issued an unfavorable decision dated June 13, 2019, finding that Plaintiff has not been under a disability, as defined by the Social Security Act, since the date of his application on August 24, 2017 (Tr. 10–32). Plaintiff's request for review was denied by the Appeal's Council, making ALJ Eastham's decision the final agency decision (Tr. 1–6). Plaintiff has exhausted his administrative remedies and has filed a timely complaint in this Court seeking judicial review of the ALJ's adverse decision.

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is presented in mostly chronological order and directed at the points raised by Plaintiff.

---

[3] Plaintiff indicated in his brief that he was also challenging the ALJ's assessment of his Parkinson's disease (Doc. 29, p. 5). Plaintiff did not, however, set forth any facts or develop any sort of argument regarding his Parkinson's disease (*see* Doc. 29). He only discussed his COPD (*see* Doc. 29). The Court therefore declines to address any issues related to Plaintiff's Parkinson's disease. *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.") (citation omitted).

The records reflect that Plaintiff was born in December 1966 and was 50 years old with an eighth-grade education at the time he applied for SSI benefits in August 2017 (*e.g.*, Tr. 25, 208). Records indicate that Plaintiff started smoking at age 10 and had a smoking history of "at least 37 pack years" (Tr. 1011; *see also* Tr. 299).[4] Records also indicate that he has a history of COPD and asthma "for years" (Tr. 299), but there is no indication as to when exactly he was diagnosed with COPD or what stage the disease was at the time of diagnosis.

Plaintiff saw his primary care provider (PCP) in August 2016 for a routine follow-up visit and "breathing problems" (Tr. 294–98).[5] He reported his breathing was better but not at his baseline (Tr. 294). He also reported being very tired throughout the day, snoring while he sleeps, and waking up gasping for air (Tr. 294). He had a pulse oximetry reading of 93% and, on examination, there was "air movement throughout" his lungs with "no wheezes, rales, rhonchi" (Tr. 297).[6] The records show that, at the time of this appointment,

---

[4] The number of pack years is calculated by multiplying the number of packs of cigarettes smoked per day by the number of years the claimant smoked. *Consolidation Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 732 F.3d 723, 728 n.2 (7th Cir. 2013). For example, if a claimant smokes two packs a day for twenty years, that is considered forty pack years. *Id.* A smoker who consumed one pack a day for forty years would also be credited with forty pack years. *Id.*

[5] Records from Plaintiff's primary care provider(s) (PCP), first at the Sesser Community Health Center and then the Mt. Vernon Community Health Center, are referred to in the ALJ's decision as Exhibits C2F (Tr. 270–98), C4F (Tr. 349–57), and C9F (Tr. 843–45).

[6] Pulse oximetry measures oxygen levels in the blood. Normal oxygen saturation levels range between 95% and 100%, but levels may be somewhat lower and considered acceptable for individuals with COPD. Values under 90% are considered low, and a reading below 88% requires immediate medical attention. MEDLINE PLUS, *Pulse Oximetry*, https://medlineplus.gov/lab-tests/pulse-oximetry/ (last visited March 2, 2023); MAYO CLINIC, *Hypoxemia*, https://www.mayoclinic.org/symptoms/hypoxemia/basics/definition/SYM-20050930?p=1 (last visited March 22, 2023). *See also* Barbara Yawn, MD, MSc, FAAFP, et al., *Treatment Options for Stable Chronic Obstructive Pulmonary Disease: Current Recommendations and Unmet Needs*, CLEVELAND CLINIC JOURNAL OF MEDICINE, February 2018, *available at* https://www.ccjm.org/content/85/2_suppl_1/S28 (indicating that "severe resting hypoxemia" is defined as an SpO2 of less than 88%).

Plaintiff was using various medications for his COPD, including Symbicort,[7] used twice a day; Combivent Respimat,[8] to be used four times a day or as needed for wheezing; and Ipratropium-Albuterol solution,[9] to be used up to three times daily as needed for wheezing (Tr. 296). Plaintiff's PCP ordered a sleep study and he subsequently began using a CPAP machine (*see* Tr. 275).[10]

During appointments over the next five months related to conditions other than his COPD, it was noted that Plaintiff's lungs were clear, he had "good air movement," and he did not have any respiratory complaints (Tr. 289–93, 285–89, 280–84). His PCP commented that his COPD was "stable." In February 2017, however, his PCP noted "mild crackles middle lung bilaterally" and ordered a chest x-ray (Tr. 278). The x-ray report indicates that previous x-rays from December 2015 and June 2014 were used as

---

[7] Symbicort is brand name combination inhaler that contains both budesonide (a corticosteroid that reduces inflammation) and formoterol (a bronchodilator, specifically a long-acting beta-agonist (LABA), that relaxes muscles in the airways to improve breathing). It is used as a maintenance treatment in patients with COPD to prevent and control symptoms. MEDLINE PLUS, *COPD – control drugs*, https://medlineplus.gov/ency/patientinstructions/000025.htm (last visited March 2, 2023).

[8] Combivent Respimat is a brand name combination inhaler that contains both albuterol and ipratropium bromide, which are short-acting bronchodilators. It is used for patients with COPD who continue to have bronchospasms (airway narrowing) and require a second inhaler. MEDLINE PLUS, *Albuterol and Ipratropium Oral Inhalation*, https://medlineplus.gov/druginfo/meds/a601063.html (last visited March 2, 2023); COMBIVENT RESPIMAT, https://www.combivent.com/ (last visited March 2, 2023).

[9] Ipratropium-Albuterol is a solution that is inhaled using a nebulizer and contains both albuterol and ipratropium, which are short-acting bronchodilators. It is used to prevent wheezing, difficulty breathing, chest tightness, and coughing in people with COPD whose symptoms have not been controlled by a single inhaled medication. MEDLINE PLUS, *Albuterol and Ipratropium Oral Inhalation*, https://medlineplus.gov/druginfo/meds/a601063.html (last visited March 2, 2023).

[10] Oxygen desaturation during sleep has been long recognized in patients with COPD. B.R. Celli, *et al.*, *Standards for the Diagnosis and Care of Patients with Chronic Obstructive Pulmonary Disease*, 152 AM. J. OF RESPIRATORY AND CRITICAL CARE MEDICINE 1164 (1995). It can be due to the COPD itself rather than to sleep apnea, but oxygen saturation is more pronounced when the two conditions co-exist.

comparisons and states, amongst other things, "[s]light chronic lung changes are demonstrated. . . . No acute pulmonary disease" (Tr. 299). The non-examining agency physician later characterized this x-ray as "unremarkable" (Tr. 78).

In May 2017, Plaintiff still had "mild crackles" in his lungs, but his PCP wrote that his COPD was stable (Tr. 270–74). Plaintiff's three COPD medications were refilled (Tr. 274). In August 2017, which is the alleged disability onset date, Plaintiff saw his PCP to follow-up on his chronic conditions (Tr. 353). The notes from the visit indicate that Plaintiff did not endorse any respiratory complaints, he had a pulse oximetry reading of 96%, and on examination his lungs were clear (Tr. 353, 355). His prescriptions for Symbicort and the ipratropium-albuterol solution were once again refilled (Tr. 356). There is a note in the record that implied Plaintiff had been frequently using his rescue inhaler—it told Plaintiff that if he was using his "rescue inhaler more than 2-3 times per week then your COPD is NOT CONTROLLED" and he needed to have further evaluation of his breathing problem (*Id.*) (emphasis in original). In September 2017, wheezes in Plaintiff's lower lung fields were noted, but it does not appear that his PCP took any action (Tr. 349–52). Plaintiff's lungs were clear in October and November 2017, and his PCP noted that his COPD was "currently stable" (Tr. 871–74, 864, 869). The records indicate that as of November 2017, Plaintiff was prescribed five medications for his COPD (Tr. 866). He was still using Symbicort, Combivent, and the Ipratropium-albuterol

nebulizer solution, and he also now had a Spiriva inhaler to be used once a day and an albuterol sulfate nebulizer solution (*Id.*).[11]

In early January 2018, Plaintiff complained to his PCP that he was congested and coughing up phlegm (Tr. 855–60). On examination, his lungs were "normal, clear to auscultation bilaterally, good air movement" (Tr. 858). He was diagnosed with an upper respiratory infection and prescribed antibiotics (Tr. 859). Less than two weeks later, when Plaintiff presented to the emergency room after having a seizure, he was also diagnosed with a COPD exacerbation (Tr. 818). An examination showed "wheezes (diffuse inspiratory and expiratory)" and "[p]oor air movement" (Tr. 816). He was given a steroid injection and nebulizer breathing treatment (Tr. 818).

On January 16, 2018, two days after his visit to the emergency room, Plaintiff saw Dr. Raymond Leung for a physical consultative examination (CE) in connection with his application for disability (Tr. 831–39; *see also* Tr. 73 (indicating date of consultative exam)).[12] Dr. Leung wrote that Plaintiff's lungs were "clear to auscultation" with "[n]o rales, rhonchi or wheezes[,]" and "[n]o use of accessory muscles of respiration at rest." (Tr. 833).[13] Dr. Leung also noted that Plaintiff was using five COPD medications but did

---

[11] Spiriva is a brand name inhaler that contains tiotropium bromide, which is a long-acting bronchodilator (specifically a muscarinic antagonist (LAMA)), It is a once-daily, maintenance treatment used to control symptoms of COPD and reduce the likelihood of COPD exacerbations. MEDLINE PLUS, *Tiotropium Oral Inhalation*, https://medlineplus.gov/druginfo/meds/a604018.html (last visited March 2, 2023); SPIRIVA RESPIMAT, https://www.spiriva.com/ (last visited March 2, 2023).

[12] Dr. Leung's report is referred to in the ALJ's decision as Exhibit C8F.

[13] Use of accessory respiratory muscles is a physical sign of severe COPD. Zab Mosenifar, MD, FACP, FCCP, *et al.*, *Chronic Obstructive Pulmonary Disease (COPD)*, MEDSCAPE, https://emedicine.medscape.com/article/297664-overview (last visited March 20, 2023).

not mention Plaintiff's COPD diagnosis, emergency treatment for an exacerbation two days prior, or any of his symptoms, nor did Dr. Leung mention the pulmonary function test (PFT) that he apparently ordered (*see* Tr. 825-29; 835–39).

Plaintiff underwent the PFT on the same day as the consultative exam (*see* Tr. 835). The type of pulmonary function testing that was administered is called spirometry. Spirometry is used to diagnose COPD and determine the stage of disease.[14] It works by having the patient inhale as deeply as they can and then exhale as hard and fast as possible, for as long as possible, into a mouthpiece that is attached to a machine called a spirometer. The machine calculates two numbers: the FEV1, which is the amount of air the patient exhaled in the first second, and the FVC, which is the total amount of air the

---

[14] All information in this paragraph was taken from: COPD FOUNDATION, *How is COPD Diagnosed?*, https://www.copdfoundation.org/What-is-COPD/Understanding-COPD/How-is-COPD-Diagnosed.aspx (last visited March 2, 2023); COPD FOUNDATION, *Stages of COPD*, https://www.copdfoundation.org/Learn-More/I-am-New-to-COPD/Stages-of-COPD.aspx (last visited March 2, 2023).

The severity of an individual's COPD used to be based on spirometry results alone. But practitioners now know that lung function is only one aspect of understanding an individual's COPD, and it does not tell the whole story about how drastically symptoms are affecting the patient's quality of life and how their health and symptoms will progress over time. As a result, a COPD assessment now looks at spirometry results, as well as signs and symptoms, frequency of exacerbations, and the presence of other health problems. Practitioners use the collective information to categorize the severity of the individual's *disease* (which may be different from the severity of their airflow limitation) as a particular stage (which can also be referred to as levels, grades, or groups). The stages are broad guidelines that are helpful for determining treatment and predicting prognosis. Global Initiative for Chronic Obstructive Lung Disease (GOLD), *Global Strategy for the Diagnosis, Management, and Prevention of Chronic Obstructive Pulmonary Disease 2023 Report*, p. 40, *available at* https://goldcopd.org/2023-gold-report-2/; Barbara Yawn, MD, MSc, FAAFP, et al., *Treatment Options for Stable Chronic Obstructive Pulmonary Disease: Current Recommendations and Unmet Needs*, CLEVELAND CLINIC JOURNAL OF MEDICINE, February 2018, *available at* https://www.ccjm.org/content/85/2_suppl_1/S28; COPD FOUNDATION, *Stages of COPD*, https://www.copdfoundation.org/Learn-More/I-am-New-to-COPD/Stages-of-COPD.aspx (last visited March 2, 2023); HEALTHLINE, *The Four Stages of Chronic Obstructive Pulmonary Disease (COPD)*, https://www.healthline.com/health/copd/what-are-the-4-stages-of-copd (last visited March 2, 2023); WEBMD, *COPD Stages and the Gold Criteria*, https://www.webmd.com/lung/copd/gold-criteria-for-copd (last visited March 2, 2023).

patient exhaled. The patient's results are expressed as a percentage that shows how well their lung function compares to values of people of the same height, gender, age, and ethnicity with normal, healthy lungs.

Plaintiff's pre-bronchodilator test revealed an FVC of 3.13—which was 65% of the normal reference range, and an FEV1 of 2.05—which was 55% of the normal reference range (Tr. 836). The post-bronchodilator test revealed an FVC of 3.53—which was 73% of the normal reference range, and an FEV1 of 2.11—which was 56% of the normal reference range (Tr. 838). The technician noted that Plaintiff "gave good effort" and the results were reproducible (Tr. 836, 838). The technician also noted that Plaintiff had a "harsh cough" throughout the testing (*Id.*). The spirometry report does not, however, interpret the test results or characterize the severity of Plaintiff's airflow limitation (*e.g.,* mild, moderate, or severe or stage 1, 2, 3, or 4) (*see id.*).[15] Although Dr. Leung ordered the PFTs, (*see* Tr. 835-39), he also did not evaluate or comment on the test results (*see* Tr. 831–34). In fact, the Court was unable to find any analysis of the PFT by a medical professional anywhere in the record.

In late January 2018, Dr. Frank Mikell, a non-examining physician and agency consultant, reviewed Plaintiff's medical records in connection with the agency's initial review of Plaintiff's disability application (Tr. 75–78). Dr. Mikell noted that the medical

---

[15] According to the Global Initiative for Chronic Obstructive Lung Disease (GOLD) guidelines, stage 1 COPD (mild air flow obstruction) is an FEV1 above 80%. Stage 2 (moderate) is an FEV1 between 80% and 50%. Stage 3 (severe) is an FEV1 between 50% and 30%. And Stage 4 (very severe) is an FEV1 below 30%. COPD FOUNDATION, *Stages of COPD*, https://www.copdfoundation.org/Learn-More/I-am-New-to-COPD/Stages-of-COPD.aspx (last visited March 2, 2023)

records indicated a diagnosis of COPD and Plaintiff's symptoms included shortness of breath (Tr. 75, 76). Dr. Mikell further noted that a February 2017 chest x-ray was "unremarkable," a May 2017 office note indicated "mild crackles in the lungs bilaterally," and a pulmonary function test in January 2018 showed "(pre) FVC 3.13, FEV1 2.05" and "(post) FVC 3.53, FEV1 2.11" (Tr. 78). Dr. Mikell opined that Plaintiff could frequently lift and/or carry ten pounds and occasionally lift and/or carry twenty pounds (Tr. 67). Plaintiff could stand and/or walk (with normal breaks) for six hours during a workday (Tr. 76). Plaintiff could also climb ramps/stairs frequently (Tr. 77). Plaintiff had no limitations regarding exposure to extreme cold, extreme heat, and humidity, but he should avoid "concentrated exposure" to fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 77, 78). Months later in late April 2018 at the reconsideration phase, another non-examining physician and agency consultant, Dr. James Madison, issued the same opinion as Dr. Mikell (Tr. 90–93). Dr. Madison's explanation did not include any additional commentary regarding Plaintiff's COPD (*see id.*).

At appointments in March and early April 2018, Plaintiff's lungs were "clear to auscultation" with "good air movement" (Tr. 850–54, 847–48). An electrocardiogram (that he underwent prior to having foot surgery) showed his heart was potentially enlarged, so he underwent another chest x-ray and was also referred to a cardiologist (Tr. 846, 848; *see also* Tr. 850, 852–53). The x-ray report stated "[c]hronic lung changes are again demonstrated" and also noted "chronic blunting of the left costophrenic angle," but there

was "no acute pulmonary disease" (Tr. 950). There is no explanation as to the significance (or insignificance) of the x-ray results.[16]

In late April 2018, Plaintiff saw his PCP for a follow-up appointment regarding his diabetes, but he also complained of shortness of breath at rest and with exertion, chronic cough, sputum production, and wheezing (Tr. 1079), all hallmark symptoms of COPD.[17] He had a pulse oximetry reading of only 91% but on examination, his lungs had "good air movement, clear to ausculation bilaterally, no wheezes, rales, rhonchi" (Tr. 1080). His Combivent Respimat inhaler was refilled (Tr. 1081).

In May 2018, Plaintiff filled out a Function Report in connection with his application for disability. He indicated that he lived with his sister and her boyfriend (Tr. 226–36). His daily routine included taking medications, watching television, and making easy meals, like sandwiches (*Id.*). He said that he could only walk about a block until he had to stop and rest for 10-15 minutes before he could resume walking (*Id.*).

That same month, Plaintiff saw cardiologist, Dr. Walter Parham, for the first time (Tr. 954). Plaintiff reported a longstanding history of shortness of breath that typically occurred with exertion and occasional chest discomfort (Tr. 954). His pulse oximetry reading was only 91% (Tr. 958). On examination, his "[l]ungs [were] clear to ausculation bilaterally, chest wall [was] normal to palpation and percussion[,]" and his "respiratory

---

[16] Blunting of the lateral and posterior costophrenic angles is a feature associated with emphysema. RADIOPAEDIA, Pulmonary emphysema, https://radiopaedia.org/articles/pulmonary-emphysema?lang=us (last visited March 2, 2023).

[17] *See, e.g.,* Marvin Dewar, M.D., *et al., Chronic Obstructive Pulmonary Disease: Diagnostic Considerations,* 73 AM. FAM. PHYSICIAN 669 (2006), *available at* https://www.aafp.org/pubs/afp/issues/2006/0215/p669.html.

effort [was] normal" (*Id.*). Dr. Parham "strongly recommended" that Plaintiff quit smoking and he also ordered various cardiac tests, which all came back showing no evidence of myocardial ischemia or infarction (Tr. 960, 1001). At a follow-up cardiology appointment in late May, Plaintiff's pulse oximetry was 97% but on examination his "breath sounds [were] decreased bilaterally" with "no rales or wheezes" (Tr. 997, 999).[18] Plaintiff's history of COPD was noted and a referral to a pulmonologist was recommended (Tr. 1001). Plaintiff was again told to quit smoking and avoid all secondhand smoke (*Id.*)

The following day, on June 1, 2018, Plaintiff reported to his PCP that his COPD inhalers were no longer being covered by insurance (Tr. 1074–78). He complained of shortness of breath at rest and with exertion, chronic cough, sputum production, and wheezing (Tr. 1074). He had a pulse oximetry reading of only 91% but his lungs were "clear to auscultation bilaterally" with "good air movement [and] no wheezes, rales, rhonchi" (Tr. 1075). He was diagnosed with another COPD exacerbation and prescribed a steroid to reduce the inflammation in his lungs (Tr. 1076). His COPD medications were also switched (Tr. 1076–77). He was prescribed Airduo to replace the Symbicort he was previously on. He was prescribed Tudorza to take the place of Spiriva. He was prescribed

---

[18] A reduction in breath sound intensity (BSI) is often seen in patients with COPD once the airway obstruction has progressed. B.R. Celli, *et al.*, *Standards for the Diagnosis and Care of Patients with Chronic Obstructive Pulmonary Disease*, 152 AM. J. OF RESPIRATORY AND CRITICAL CARE MEDICINE 1164 (1995). *See also* R.G. Badgett, *Can Moderate Chronic Obstructive Pulmonary Disease be Diagnosed by Historical and Physical Findings Alone?*, 94 AM. J. MED. 188 (1993) ("Diminished breath sounds were the best predictor of moderate COPD.")

a Ventolin inhaler as his new rescue inhaler. And he was prescribed albuterol nebulizer treatments. He was also given a referral to a pulmonologist.

At an appointment two and a half weeks later, Plaintiff reported that he quit taking the Tudorza and Airduo because they were making his blood sugar spike and his insurance was refusing to cover the Tudorza (Tr. 1069, 1071, 1072). He once again complained of cough, wheezing, and shortness of breath (Tr. 1069). He had a pulse oximetry reading of 94% and his lungs were "normal, clear to auscultation bilaterally" with "good air movement" (Tr. 1071). He was restarted on Spiriva and Symbicort (Tr. 1071–72).

A week later, on June 25, 2018, Plaintiff had a consultation with pulmonologist Dr. Abdulmonam Ali (Tr. 1011–23). He reported a history of exertional shortness of breath, which had worsened over the last couple years. Plaintiff reported that he could not walk a few blocks without getting significant shortness of breath. He reported wheezing and intermittent cough symptoms. Plaintiff's pulse oximetry was 91% (Tr. 1014). On examination, he had "diminished air entry bilaterally" but his lungs were "clear to auscultation bilaterally" with "no wheezing, no crackles" (Tr. 1014). Dr. Ali wrote that Plaintiff's exertional shortness of breath "is likely representing COPD with his long-term use of cigarettes," however "cannot rule out other etiologies." (Tr. 1015). Dr. Ali ordered various tests, including a chest CT to assess for emphysema and any lung lesions, a pulmonary function test, and ambulatory oximetry (also referred to in the note as "6 minutes walk") (Tr. 1015). Dr. Ali also referred Plaintiff to an ENT because he had a severely deviated right nasal septum with 100% blockage of the nasal passage (Tr. 1015;

*see also* Tr. 966–72). He advised Plaintiff to begin using Flonase nasal spray and saline rinses (Tr. 1015). Dr. Ali also strongly encouraged Plaintiff to quit smoking (Tr. 1014–15).

On July 6, 2018, Plaintiff had a follow-up appointment with his PCP regarding his COPD (Tr. 1065–68). He reported that he was able to breathe out of the right side of his nose for the first time in years (Tr. 1065). But he also reported shortness of breath at rest and with exertion, chronic cough, sputum production, wheezing, and increased trouble breathing in the summer humidity (*Id*.). His PCP noted that, upon examination, Plaintiff was "[i]ll-appearing, fatigued, [in] mild distress, [and] mildly tachypneic"[19] (Tr. 1066). Plaintiff had a pulse oximetry reading of only 91% and examination of his lungs revealed "scattered wheezes throughout, diminished breathing sounds throughout, lung sounds are course, decreased air movement" (Tr. 1066, 1067). Plaintiff was diagnosed with a COPD exacerbation and given a nebulizer treatment, which resulted in "better air movement and decreased wheezing sounds" (*Id*.). Plaintiff was also started on a steroid and an antibiotic, and a chest x-ray was ordered (*Id*.). The x-ray report noted "subtle reticular opacities in the left lower lobe" as well as "small left pleural effusion . . . blunt[ing] the left costophrenic angle" and listed a diagnosis of COPD (Tr. 974). There is no explanation as to the significance (or insignificance) of the x-ray results.

Five days later, Plaintiff had a follow-up appointment with pulmonologist Dr. Ali (Tr. 1025–36). Plaintiff had not yet done the chest CT or the pulmonary function test (Tr. 1025). He reported significant improvement in his nasal symptoms, and said his

---

[19] Tachypnea is rapid, shallow breathing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §3.00(B).

breathing was at baseline (*Id*.). He reported wheezing and intermittent cough symptoms (*Id*.). He had a pulse oximetry reading of 98% and on examination, he had "diminished air entry bilaterally, clear to auscultation bilaterally, no wheezing, no crackles" (Tr. 1028). Plaintiff had the chest CT scan done on July 19, 2018, and the report noted "left basilar scarring," or scarring at the base of his left lung (Tr. 1354). The Court was unable to find any commentary from a medical professional in the record as to the significance (or insignificance) of the results. It is not clear if Plaintiff ever underwent the pulmonary function or ambulatory oximetry tests or what the results were.

In late August, Plaintiff went for a follow-up appointment at the cardiologist's office (Tr. 976–81). Plaintiff reported the only time he had chest discomfort anymore was with coughing (Tr. 976). "He is able to walk longer distances and fish most his yd without significant chest pain" (*Id*.). Plaintiff also reported that he had quit smoking (Tr. 976). He had a pulse oximetry reading of only 88% (Tr. 979). On examination of the lungs, "breath sounds [were] decreased bilaterally" with "no rales; scattered wheezes" (Tr. 979). The practitioner wrote that Plaintiff's dyspnea is "chronic but stable and significantly improved with nebulizer treatments" (Tr. 980).[20] He was told to follow up in six months.

On September 6, 2018, just one week later, Plaintiff presented to his PCP with a cough that he said had been ongoing for several weeks (Tr. 1061–64). He had a pulse oximetry reading of only 90% and, on examination, his lungs were "clear to auscultation bilaterally" with "no wheezes, rales, rhonchi [and] good air movement" (Tr. 1063). He

---

[20] Dyspnea is shortness of breath. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §3.00(B).

was diagnosed with upper respiratory tract infection and given antibiotics and Zyrtec (*Id.*).

During an endocrinologist appointment in September and a PCP appointment in October following a bout of pancreatitis, there were no respiratory abnormalities noted on exam and his pulse oximetry readings were 97% and 92%, respectively (Tr. 1043, 1047, 1058). A chest x-ray was taken on October 21, 2018 when Plaintiff was at the emergency room for abdominal pain (Tr. 1283). The x-ray report notes "[i]ncreased interstitial lung markings persist and are consistent with interstitial lung disease"[21] and "chronic blunting of the left costophrenic angle" (Tr. 1283). There is no explanation as to the clinical significance (or insignificance) of the results.

In November 2018, Plaintiff saw his PCP for a cough and congestion that he said had been ongoing for about two weeks, as well as shortness of breath, wheezing, fatigue (Tr. 1052–56). His pulse oximetry reading was 94% and on examination, he had "scattered wheezes throughout" his lungs (Tr. 1054). He was given a nebulizer treatment and the wheezing improved (*Id.*). He was also diagnosed with an upper respiratory infection and bronchitis (Tr. 1054, 1055). He was prescribed antibiotics and steroids, and his Combivent Respimat inhaler was also refilled (Tr. 1054).

During an appointment with a neurologist in December 2018 regarding his seizures and a primary care appointment in January 2019, there were no respiratory

---

[21] Interstitial lung disease is an umbrella term used for a large group of diseases that cause scarring of the lungs. AM. LUNG ASSOC., *Interstitial Lung Disease,* https://www.lung.org/lung-health-diseases/lung-disease-lookup/interstitial-lung-disease (last visited March 2, 2023). Smoking can cause interstitial lung disease. *Id.*

abnormalities noted on exam (Tr. 941, 945, 1050). Plaintiff's PCP noted that his COPD was "well controlled" (Tr. 1051)

At the evidentiary hearing in April 2019, Plaintiff testified that he did not do any chores around the house because his sister and her boyfriend did not let him (Tr. 45). He does not have a driver's license (*Id.*). When asked if he went anywhere besides the doctor, he responded that he might go to the grocery store once a month with his sister (*Id.*). Plaintiff testified that he had quit smoking a year prior and used inhalers to treat his COPD (Tr. 39; *see also* Tr. 976). He stated that he used his rescue inhaler eight to nine times a day (Tr. 42). He was asked if there was anything specific that caused him to need his rescue inhaler and he said, "I can walk to the door here and I'm out of air" and "I don't dare run" (*Id.*). He also said that exposure to second-hand smoke aggravates his breathing problems (*Id.*). He can only stand for ten minutes and then has to sit down because he gets "short-winded" and "need[s] air" (Tr. 45).

## THE ALJ'S DECISION

In his decision denying Plaintiff's claim for benefits, ALJ Eastham followed the standard five-step analysis for determining whether a person is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 416.920; *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021). *See also* 42 U.S.C. § 1382c(a)(3)(A) (defining disability); 20 C.F.R. § 416.905 (same). At step one, the ALJ determined that Plaintiff was not presently employed and had not engaged in substantial gainful activity since the alleged onset date (Tr. 15). At step two, the ALJ found that Plaintiff had the severe impairments of pseudo seizures, chronic obstructive pulmonary disease (COPD), Parkinson's disease, diabetes

mellitus, depression, bipolar disorder, anxiety, panic disorder, and personality disorder

(as well as a number of non-severe impairments) (Tr. 16). At step three, the ALJ

determined that none of Plaintiff's conditions, alone or in combination, met or medically

equaled a listed impairment (Tr. 17–19). The ALJ then found that Plaintiff retained the

ability to perform less than a full range of light work and could:

- frequently reach, handle, and finger with the right upper extremity;
- frequently use foot controls with the bilateral lower extremities;
- frequently balance, stoop, kneel, crouch, and climb ramps or stairs;
- perform simple, goal-oriented tasks that are not at a production rate pace;
- he could understand and follow simple, routine, rote instructions,
- he could make simple, routine, work-related decisions;
- have frequent contact with supervisors and frequent work-related contact with coworkers; and
- have occasional work-related contact with the public, but
- could never crawl or climb ladders, ropes, or scaffolds; and
- should avoid concentrated exposure to pulmonary irritants and hazards such as unprotected heights and open moving machine parts.

(Tr. 19-20)

At Step 4, the ALJ concluded that Plaintiff could perform his past relevant work

as a construction worker II (Tr. 25). Records show that he previously worked for a mobile

home company as "a general laborer," doing maintenance on the lots, loading and

unloading trucks, moving mobile homes and setting them up (Tr. 36–37, 1011). The ALJ

went on to make an alternative finding at Step 5 that, based on the testimony of a

vocational expert, Plaintiff could be employed as a housekeeper (440,000 jobs nationally),

inspector and hand packager (118,000 jobs nationally), and/or hand bander (311,000 jobs

nationally) (Tr. 25–26).

<u>ISSUES RAISED BY PLAINTIFF</u>

1. Whether the ALJ failed to properly evaluate Plaintiff's RFC and adequately explain how Plaintiff can maintain light work when he suffers from COPD, which causes shortness of breath on exertion?

2. Whether ALJ Eastham's appointment was invalid and he lacked the authority to issue a decision on Plaintiff's claim for SSI benefits?

(Doc. 29; Doc. 37).

<u>DISCUSSION</u>

The scope of judicial review is limited to determining whether the ALJ applied the correct legal standard in reaching their decision, whether the ALJ's decision is supported by substantial evidence, and whether the ALJ "buil[t] an accurate and logical bridge from the evidence to [their] conclusion" that the claimant is not disabled. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (internal citations omitted). The court reviews the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021). The court also will not "uphold an ALJ's decision by giving it different ground to stand upon." *Jeske*, 955 F.3d at 587. The ALJ's decision will be reversed "only if the record compels a contrary result." *Deborah M.*, 994 F.3d at 788 (internal quotation marks and citation omitted).

**A. RFC ASSESSMENT RELATIVE TO PLAINTIFF'S COPD**

Residual functional capacity is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms . . . may cause physical or mental limitations or restrictions that may

affect his or her capacity to do work- related physical and mental activities. SSR 96-8p, 61 Fed. Reg. 34474-01, 34475 (July 2, 1996). "Your residual functional capacity is the most you can still do despite your limitations." 20 C.F.R. § 416.945(a)(1). In assessing a claimant's RFC, the ALJ must consider "all of the relevant medical and other evidence" regarding "all of [the claimant's] medically determinable impairments . . . including [those] that are not 'severe[.]'" *Id.* at § 416.945(a)(3). *See also Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) ("When determining residual functional capacity, the ALJ "must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling.") (citation omitted).

ALJ Eastham determined that one of Plaintiff's severe impairments was chronic obstructive pulmonary disease (COPD) (Tr. 16). The ALJ noted that Plaintiff said he uses an emergency inhaler and had quit smoking (Tr. 20). The ALJ further noted that Plaintiff said he is out of air after walking to the door and can only stand for about 10 minutes before he needs to sit, and he does not do any household chores (Tr. 20). The ALJ determined, however, that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms was not entirely consistent with the medical evidence and other evidence in the record (Tr. 20). The ALJ wrote:

> While the record further documents severe physical impairmen[t] of COPD . . . it appears the respiratory symptoms have been largely stable with conservative treatment . . . . [C]hest x-rays have confirmed chronic lung changes without evidence of acute pulmonary disease and 2018 pulmonary function testing demonstrated FVC 65–73% and FEV1 55–56% (Exhibits C2F, C5F, and C16F). Primary care records do note some instances of mild crackles and wheezes, in addition to more significant findings during a

> COPD exacerbation (Exhibits C2F, C4F, C9F, C13F). Otherwise, however, the claimant's lungs were clear to auscultation with good air movement at several appointments, his symptoms were improved with outpatient medication management including inhalers and a nebulizer, and his COPD was often described as stable (Exhibits C2F, C4F, C8F, C9F, C13F). Most notably, early 2019 primary care notes indicate the claimant's COPD is well controlled (Ex. C13F). . . . Overall, it appears the COPD has been largely stable with minimal exacerbations . . . .

(Tr. 21, 22). Elsewhere in the decision, the ALJ mentioned twice more that Plaintiff's COPD was stable and managed with "conservative treatment" (Tr. 17, 24).

The ALJ determined that due to Plaintiff's various impairments, he was restricted to "less than a full range of light work with postural, environmental, and upper and lower extremity limitations" (Tr. 20–21).[22] In particular, in order to accommodate Plaintiff's COPD, the ALJ said Plaintiff "could never crawl or climb ladders, ropes, or scaffolds; and he should avoid concentration [sic] exposure to pulmonary irritants." (Tr. 22).

After reviewing the parties' briefs, the ALJ's decision, and the evidence in the record, the Court is not convinced that the ALJ adequately or fairly considered all of the important evidence related to Plaintiff's COPD. While the ALJ's explanation initially reads as though he made a balanced assessment of the evidence, closer scrutiny proves otherwise.

---

[22] "Light work" is a term of art the Social Security Administration uses to categorize jobs that require lifting or carrying ten pounds frequently and up to twenty pounds occasionally; "a good deal of standing or walking," meaning off and on for six hours during an eight-hour workday with intermittent sitting, or "sitting most of the time with some pushing and pulling of arm or leg controls." *Murphy v. Colvin*, 759 F.3d 811, 818 (7th Cir. 2014); *Clifford v. Apfel*, 227 F.3d 863, 868 n. 2 (7th Cir. 2000); *See also Sosinski v. Saul*, 811 F. App'x 380 (7th Cir. 2020); *Stage v. Colvin*, 812 F.3d 1121, 1124 (7th Cir. 2016); 20 C.F.R. § 416.967(b); SSR 83-10, 1983-1991 Soc.Sec.Rep.Serv. 24, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

The Court will begin with Plaintiff's pulmonary function test. As previously mentioned, there does not appear to be any statements in the record from medical professionals interpreting Plaintiff's PFT results. None of the records from Plaintiff's primary care provider or the specialists contain any mention of the PFT results, at least not that the Court could find. The two agency doctors appear to be the only medical professionals who said anything at all about the PFT. But they did nothing more than recount Plaintiff's raw results, without any further commentary or analysis whatsoever (Tr. 78, 93). The explanations provided in the narrative portion of their opinions were so vague and devoid of context that the Court cannot even tell what their general impression of the PFT results was. But they apparently did not think the results corroborated Plaintiff's assertion that he was disabled because they both concluded that Plaintiff remained capable of light work.

The ALJ then uncritically accepted the agency physicians' conclusions. Like the agency physicians, the ALJ simply recounted Plaintiff's PFT raw results and stated that they did not meet the criteria of Listing 3.02 for Chronic Respiratory Disorders (Tr. 17). But the ALJ said nothing more, such as what the PFT results revealed about Plaintiff's lung function (*see* Tr. 20–24). While the ALJ resisted the urge to "play doctor" and interpret the results of diagnostic tests himself,[23] his silence makes it impossible for the Court to tell whether he fairly evaluated the record. The Court cannot even tell what the

---

[23] *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) ("We have said repeatedly that an ALJ may not 'play doctor' and interpret 'new and potentially decisive medical evidence' without medical scrutiny.") (citation omitted); *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) ("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves.")

ALJ's general understanding of the PFT results was. Information obtained through the Court's own research suggests that Plaintiff's PFT results show he had a "moderate" air flow obstruction (but was very close to the "severe" range), and his lung function was down to approximately half of a person of his age, height, race, and gender with normal, health lungs.[24] Nothing about the ALJ's decision reads as though he understood Plaintiff only had half of his lungs remaining.

An additional problem with the ALJ crediting the agency physician's opinions is that they did not have the opportunity to consider any of the diagnostic imaging studies that Plaintiff underwent in 2018: the chest x-rays taken in April, July, and October, and the chest CT done in July (Tr. 950, 974, 1283, 1354).[25] The ALJ made no mention of any of these imaging studies in his decision nor cited to the exhibits containing the records of these studies (*see* Tr. 20–24), which again, makes it impossible to tell whether he fairly evaluated the record. The Court was unable to find any medical notes from Plaintiff's treating providers as to the clinical significance (or insignificance) of these studies. And it is beyond the knowledge of a layman.[26] These imaging studies may corroborate Plaintiff's complaints, or they may lend further support to the ALJ's assessment, but

---

[24] *See, e.g.,* COPD FOUNDATION, *Stages of COPD*, https://www.copdfoundation.org/Learn-More/I-am-New-to-COPD/Stages-of-COPD.aspx (last visited March 2, 2023).

[25] All of these diagnostic studies occurred after Dr. Frank Mikell's initial review in January 2018 and Dr. James Madison's review on reconsideration in April 2018, with the exception of the April 2018 chest x-ray. The x-ray took place on April 3, 2018 (Tr. 950), while Dr. Madison's review took place on April 24, 2018 (Tr. 93). Dr. Madison, however, did not mention the April 2018 x-ray and there is nothing that indicates he was given a copy of the report (*see* Tr. 90–93).

[26] Information obtained through the Court's own research suggests that, at the very least, the studies showed signs of damaged, impaired, and/or diseased lungs. The recognizes that it is not qualified to

either way, the ALJ was not allowed to wholly ignore them. An ALJ has to "submit to medical scrutiny diagnostic scans of new and potentially decisive medical evidence." *Kennedy v. Kijakazi*, No. 22-2258, 2023 WL 1990303, at *3 (7th Cir. Feb. 14, 2023) (quoting *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)). *Accord Kemplen v. Saul*, 844 F. App'x 883, 888 (7th Cir. 2021) ("[T]he ALJ must seek an additional medical opinion if there is potential decisive evidence that postdates the state agency consultant's opinion.") (citations omitted). The lack of information as to what the various diagnostic tests revealed, coupled with the lack of commentary from Plaintiff's treating physicians about the severity, stage, and/or progression of his COPD and pulmonary function, highlights the need for someone with expertise to opine on what the PFT and diagnostic imaging say about Plaintiff's respiratory functional limitations.

The ALJ's failure to meaningfully discuss the PFT results or acknowledge the other imaging studies leaves the Court unsure of whether he fairly considered the important objective medical evidence in assessing Plaintiff's RFC, which it turn precludes the Court from finding that his decision rests on substantial evidence. The ALJ's decision is further compromised by his failure to sufficiently articulate the reasoning that led him to find Plaintiff had "minimal exacerbations" and his symptoms were stable and/or well-controlled and managed with only "conservative treatment." The ALJ "must adequately articulate [their] analysis so that [the Court] can follow [their] reasoning." *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015).

First, the ALJ did not explain what he meant by "minimal exacerbations." The Global Initiative for Chronic Obstructive Lung Disease ("GOLD") defines "frequent

exacerbations" as two or more per year.[27] And it classifies exacerbations as "moderate" if they are treated with short-acting bronchodilators plus oral corticosteroids and/or antibiotics.[28] Here, the records show that Plaintiff had three diagnosed exacerbations in 2018, in January, June, and July (Tr. 818, 1067, 1076). Each time, he was treated with a short-acting bronchodilator and steroids, and he also received an antibiotic for the June exacerbation (*Id.*). Thus, according to GOLD, Plaintiff was having frequent, moderate exacerbations, which seems to lend support to Plaintiff's statements about the severity of his condition and suggest that the ALJ misunderstood or mischaracterized the evidence.

Second, the ALJ did not explain what he meant by "conservative treatment." The ALJ wrote that Plaintiff's "symptoms were improved with outpatient medication management, including inhalers and a nebulizer" (Tr. 21). The Court is unable to tell from this brief statement whether the ALJ properly considered the full scope of Plaintiff's treatments. Prior to the administrative hearing, Plaintiff's medical records listed active prescriptions for Combivent, Spiriva, Symbicort, and a Ventolin rescue inhaler (Tr. 1026), and perhaps ipratropium-albuterol solution as well (Tr. 1049, 1053). These inhalers and nebulizer treatments, which were intended for daily usage, represent both types of short-acting bronchodilators,[29] both types of long-acting bronchodilators,[30] and an inhaled

---

[27] Global Initiative for Chronic Obstructive Lung Disease (GOLD), *Global Strategy for the Diagnosis, Management, and Prevention of Chronic Obstructive Pulmonary Disease 2023 Report*, p. 37, *available at* https://goldcopd.org/2023-gold-report-2/.

[28] *Id.* at p. 136. A mild exacerbation is one that is treated with short-acting bronchodilators only. And a severe exacerbation is one that requires hospitalization, or an emergency room visit.

[29] A beta-agonist (SABA) and an anti-muscarinic (SAMA).

[30] A beta-agonist (LABA) and an anti-muscarinic (LAMA).

corticosteroid. Plaintiff also used a CPAP machine while sleeping. And during COPD exacerbations, he was given bronchodilator treatments, oral steroids, antibiotics. The range of daily medications prescribed to Plaintiff goes well beyond the first stage of treatment for mild obstruction, and is indicative of an escalation in treatment, which typically occurs due to frequency of exacerbations, lack of improvement, and /or worsening symptoms or functional status.[31] It is unclear from the record what additional treatment the ALJ believed is available or was needed to push Plaintiff into the realm beyond "conservative treatment." To the extent that the ALJ is inferring that such unspecified additional treatments were not prescribed because Plaintiff was not experiencing significant problems, this inference appears to be the ALJ's own and the ALJ failed explain how it is supported by the record.

Third and finally, the ALJ does not explain the significance of Plaintiff's COPD being characterized as stable or well-controlled. These statements by Plaintiff's medical providers do not actually provide any sort of illustrative information about the extent of Plaintiff's symptoms or his COPD-related limitations. Characterizing his COPD as

---

[31] *See* BMJ BEST PRACTICE, *Chronic Obstructive Pulmonary Disease – Management - Approach*, https://bestpractice.bmj.com/topics/en-us/7/management-approach (last visited March 3, 2023 ("There is a stepwise approach to therapy and treatment should be individualized for general health status and comorbid conditions."); Zab Mosenifar, MD, FACP, FCCP, *et al.*, *Chronic Obstructive Pulmonary Disease (COPD)*, MEDSCAPE, https://emedicine.medscape.com/article/297664-overview (last visited March 20, 2023) (stage 1 mild obstruction should be managed with a short-acting bronchodilator as needed; in contrast, used of a short-acting bronchodilator, long-acting bronchodilator and
Barbara Yawn, MD, MSc, FAAFP, et al., *Treatment Options for Stable Chronic Obstructive Pulmonary Disease: Current Recommendations and Unmet Needs*, CLEVELAND CLINIC JOURNAL OF MEDICINE, February 2018, *available at* https://www.ccjm.org/content/85/2_suppl_1/S28. *See also* Global Initiative for Chronic Obstructive Lung Disease (GOLD), *Global Strategy for the Diagnosis, Management, and Prevention of Chronic Obstructive Pulmonary Disease 2023 Report*, *available at* https://goldcopd.org/2023-gold-report-2/;

"stable" or "well-controlled" did not mean that his baseline airflow obstruction as measured by the PFT had improved, that his functional impairments had resolved, or that he was now able to perform the standing, walking, and stair-climbing requirements of light work. These characterizations could have just meant that his baseline symptom burden was not getting worse and/or that he had gone a certain number of months without an exacerbation.[32] *See Murphy v. Colvin*, 759 F.3d 811, 818-19 (7th Cir. 2014) ("Simply because one is characterized as 'stable' or 'improving' does not mean that [one] is capable of . . . work[.]"); *Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce."); *Karen C. v. Kijakazi*, No. 1:21CV410, 2022 WL 1448598, at *5 (N.D. Ind. May 9, 2022) ("'[S]tabilty does not necessarily indicate a lack of disability."); *Johnson v. Colvin*, No. 15 C 9737, 2017 WL 219514, at *5 (N.D. Ill. Jan. 19, 2017) (in order to use response to treatment as a basis for discounting symptoms, "the ALJ must connect how his improvement restored Plaintiff's ability to work").

The ALJ also failed to explain to explain the significance of exams showing Plaintiff's lungs were "clear to auscultation with good air movement, and it is not obvious to the Court. For one thing, Plaintiff's lungs were noted to be clear with good air movement on a day where he was diagnosed with a COPD exacerbation (Tr. 1075, 1076). The pulmonologist also noted that Plaintiff's lungs were clear to auscultation at the exact same time that he had diminished air entry (Tr. 1014, 1028). These medical records make

---

[32] Suzanne G. Bollmeier, PharmD, et al., *Management of Obstructive Pulmonary Disease Colon a Review Focusing On Exacerbations*, 77 Am. J. Health Sys. Pharmacy 259, 259 (2020) ("COPD is defined as being 'stable' when symptoms are well managed and pulmonary decline is minimized . . . .).

the Court question the meaning of the notation "clear to auscultation" in regard to a patient with COPD and question whether perhaps the ALJ misinterpreted the significance.[33] As for "good air movement," it is true that Plaintiff's PCP often made this remark. However, the cardiologist and pulmonologist—specialists who were specifically enlisted to evaluate Plaintiff's breathing-related issues—remarked on four occasions from late spring through late summer of 2018 that Plaintiff had diminished air flow or decreased breath sounds (which is indicative of reduced airflow).[34] During this same time and throughout the rest of 2018, Plaintiff's oxygen saturation readings were routinely in the low-90s (from May to November, his readings were 91%, 97%, 91%, 94%, 91%, 91%, 98%, 88%, 90%, 97%, 92%, 94%). The ALJ, however, ignored the evidence regarding Plaintiff's diminished air flow and oxygen saturation, both of which seem to undercut the ALJ's assessment that Plaintiff is capable of light work. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

Finally, the Court must address the ALJ's failure to build a logical bridge from the evidence to his assessment that Plaintiff was capable of a reduced range of light work. Light work as defined by 20 C.F.R. 416.967(b) can entail, amongst other things, "a good

---

[33] *See* Abraham Bohadana, *et al.*, *Fundamentals of Lung Auscultation*, 370 NEW ENGLAND J. OF MED. 744, 745 (2014) (indicating the clinical correlation of normal lung sounds "is diminished by factors affecting sound generation (e.g., hypoventilation, airway narrowing) or sound transmission (e.g., lung destruction, pleural effusion, pneumothorax)"). *See also id.* at 749 ("Wheezes may be absent in patients with severe airway obstruction.").

[34] MEDLINE PLUS, *Breath Sounds*, https://medlineplus.gov/ency/article/007535.htm (last visited March 3, 2023).

deal of standing or walking," meaning off and on for six hours during an eight-hour workday with intermittent sitting. *Murphy v. Colvin*, 759 F.3d 811, 818 (7th Cir. 2014); *Clifford v. Apfel*, 227 F.3d 863, 868 n. 2 (7th Cir. 2000); *See also Sosinski v. Saul*, 811 F. App'x 380 (7th Cir. 2020); *Stage v. Colvin*, 812 F.3d 1121, 1124 (7th Cir. 2016); 20 C.F.R. § 416.967(b); SSR 83-10, 1983-1991 Soc.Sec.Rep.Serv. 24, 1983 WL 31251, at *5–6 (Jan. 1, 1983). Plaintiff has been diagnosed with COPD and his lung function was objectively measured to be approximately half the normal function, which in itself gives the Court pause about the ALJ's assessment that Plaintiff is still capable of working as a "Construction Worker II," or standing/walking for six hours of an eight-hour workday. *See, e.g.,* Zab Mosenifar, MD, FACP, FCCP, *et al., Chronic Obstructive Pulmonary Disease (COPD)        Clinical        Presentation,*        MEDSCAPE, https://emedicine.medscape.com/article/297664-clinical (last visited March 20, 2023) ("By the time the FEV1 has fallen to 50% of predicted, the patient is usually breathless upon minimal exertion."). It defies reason and logic to think that Plaintiff is capable of *frequently* climbing stairs, given his condition. Similarly bewildering is the ALJ's decision not to restrict Plaintiff's exposure to extreme heat, extreme cold, and humidity given that both hot and cold weather are associated with increased respiratory symptoms, as well as increased COPD exacerbations, and all of Plaintiff's exacerbations documented in the record occurred in the winter and summer months.[35]

---

[35] Nadia N. Hansel, MD, MPH, et al., *The Effects of Air Pollution and Temperature on COPD* (2016), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4878829/; AM. LUNG ASS'N, *Weather and Your Lungs,* https://www.lung.org/blog/weather-and-your-lungs (last visited March 3, 2023).

The determination of whether Plaintiff is capable of maintaining light work is critical in this case. At the time of the alleged onset date of disability in August 2017, Plaintiff was fifty (50) years old, which is defined as a person closely approaching advanced age. 20 C.F.R. § 416.963(d). He has an eighth-grade education, which the ALJ characterized as "a limited education" (Tr. 26). And the ALJ found that Plaintiff's previous job was "unskilled" (Tr. 26; *see also* Tr. 47). Under these circumstances, if Plaintiff was limited to sedentary work, he would be considered presumptively disabled under Rule 201.09 of the Medical-Vocational Guidelines ("Grids"). 20 C.F.R. Pt. 404, Subpt. P, App. 2, Sec. 201.00, Table 1, Rule 201.09. Thus, the difference between Plaintiff's ability to maintain light work and the ability to maintain sedentary work is dispositive.

In sum, the Court is not assured that the ALJ considered all of the relevant evidence in record, and of the evidence that the ALJ *did* consider, the Court is not assured that he fairly assessed it. Moreover, the ALJ failed to offer meaningful explanations for a number of his findings that were critical to his overall determination that Plaintiff was not disabled. As a result of these errors, the Court is unable to properly review the ALJ's decision and cannot conclude that the ALJ's decision is supported by substantial evidence. The ALJ's decision therefore must be reversed.

The Court stresses that this Memorandum and Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period, or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

**B.  Legitimacy of the ALJ's Appointment**

In light of the Court's conclusion that the ALJ's decision must be reversed on the merits, the Court need not reach the question of whether ALJ Eastham was properly appointed or Plaintiff's other related arguments. The Court also notes, however, that the authority Plaintiff relied on in making his arguments regarding the validity of the ALJ Eastham's appointment—*Brian T.D. v. Kijakazi*, 580 F.Supp.3d 615 (D. Minn. Jan. 20, 2022), (*see* Docs. 35, 37)—was very recently overturned by the Eighth Circuit Court of Appeals. *Dahle v. Kijakazi*, 62 F.4th 424 (8th Cir. 2023) (holding that Nancy Berryhill was properly serving as the Acting Commissioner of the Social Security Administration when she ratified the appointments of the agency's ALJs).

Because the Court declines to address this issue, the Commissioner's "Motion to Strike Portions of Plaintiff's Supplemental Brief, or in the Alternative, For Additional Pages Within Which to Respond, and an Extension of Time" (Doc. 38) is therefore moot.

C<small>ONCLUSION</small>

The Commissioner's final decision denying Plaintiff Randle B.'s applications for Supplemental Security Income (SSI) is **REVERSED**, and the case **REMANDED** for further proceedings consistent with this Order pursuant to sentence four of 42 U.S.C. § 405(g). The Commissioner's "Motion to Strike Portions of Plaintiff's Supplemental Brief, or in the Alternative, For Additional Pages Within Which to Respond, and an Extension of Time" (Doc. 38) is **MOOT**.

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

IT IS SO ORDERED.

DATED: March 23, 2023

s/ Mark A. Beatty
MARK A. BEATTY
United States Magistrate Judge